Simon P. Douthart, Executor, etc. v. Frank G. Logan, Benjamin B. Bryan and Theron Logan.

### Same v. Same.

1. GOOD WILL—*Of a Partnership—Existence of, a Question of Fact.*— Upon the question of the existence of a " good will" as a firm asset, where different conclusions might be reached by reasonable and fair-minded persons, the findings of the court below on such question are conclusive.

2. SAME—*Defined.*—The " good will" of a partnership may be defined as every possible advantage acquired by the firm in carrying on its business, whether connected with premises, name, or other matter.

3. SAME—*Described by Story.*—"Good will" may be properly described to be the advantage or benefit which is acquired by an establishment beyond the mere value of the capital, stock, funds or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position or common celebrity, or reputation for skill, or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices.

Douthart v. Logan.

4.  Same—*In What Cases it Does Not Exist.*—No "good will" can exist except in cases of commercial or trade partnerships. It does not exist in cases of professional business depending on the personal skill of, and confidence in the particular partner, in the absence of a special contract.

5.  Same—*Partnership in the Commission Business.*—The court holds that no "good will" exists in a partnership engaged in the business of buying and selling grain and produce on commission, in the absence of a special contract.

**Bill by Surviving Partners.**—Appeal from the Circuit Court of Cook County; the Hon. Murray F. Tuley, Judge, presiding. Heard in this court at the March term, 1899. Affirmed. Opinion filed December 14, 1899.

**Statement by the Court.**—Appellant filed his bill in the Circuit Court of Cook County against appellees for an accounting of the copartnership business of F. G. Logan & Co., a firm composed of appellant's testator and appellees, and also of the copartnership business of the firm of F. G. Logan, which latter firm was composed of the appellees, and asking that appellees pay the amount which might be found due on such accounting to appellant, also asking that a receiver be appointed to sell the partnership property, including the good will, to collect the assets, and fully wind up the copartnership of F. G. Logan & Co.

Appellees answered the bill, to which replication was filed, and the cause was consolidated with an appeal by appellant to said Circuit Court from certain proceedings in the Probate Court of Cook County in the estate of Daniel Butters, deceased, in which the Probate Court denied an application for a rule on the surviving partners of F. G. Logan & Co. to inventory certain open accounts of that firm, and overruling objections of the executor to and approving the partnership inventory and appraisement and supplemental partnership inventory.

A hearing of the consolidated causes was had before the chancellor, which resulted in a decree finding the facts substantially as hereinafter stated, confirming the inventories and appraisement in the Probate Court, and decreeing that all the doings of appellees, as surviving partners of F. G.

Logan & Co., were proper and correct, and as members of the firm of F. G. Logan; that appellees did right in failing to inventory a good will of the firm of F. G. Logan & Co., in appraising the leases of said firm, as being of no value, in failing to inventory the open trades of said firm, and that the sum of $1,154.68, paid by appellees to appellant on December 28, 1898, is 6-32 of all the profits of the business of F. G. Logan & Co. collected by appellees since October 10, 1896, and is all thereof to which appellant is entitled. The decree also directs appellees, as surviving partners, to collect the remainder of the choses in action in their hands belonging to the firm of F. G. Logan & Co., make account thereof to said Probate Court, and pay to appellant 6-32 thereof, after deducting expenses of collection.

The decree further directs that appellees pay to appellant the sum of $2,163.88, which the court finds is 6-32 of the net profits of the business of the firm of F. G. Logan & Co., as carried on by appellees, from the 12th day of August to the 10th day of October, 1896, less the sum of $523.77 theretofore paid by appellees as surviving partners to said appellant, to wit, the sum of $1,640.11.

From this decree the appeal herein is taken, and both errors and cross-errors are assigned. The appellant claims that the court erred in not requiring appellees to account for the good will of the business of the firm of F. G. Logan & Co., and for certain leases and open trades belonging to that firm, and not requiring appellees to account for the net profits earned by them after the 10th day of October, 1896, while doing business under the firm name of F. G. Logan, and also in rejecting certain evidence of an expert witness, which, it is claimed, would show the existence and value of the good will.

Appellees, under their cross-errors, claim that the court erred in requiring them to account to appellant for 6-32 of the net profits of the business of F. G. Logan & Co. from August 12 to October 10, 1896, instead of 1-24 of such profits.

The evidence shows that from about the year 1877 and up to the filing of the bill in this case, the appellee Frank

G. Logan, had been engaged in the commission business in the city of Chicago, being associated with different persons as partners during that time, and that for sixteen years prior to 1896, the firms with which he was associated bore the firm name of F. G. Logan & Co.   In January, 1891, he became associated in business with Daniel Butters and two other persons, and the partners of the firm were changed five times thereafter, in 1893, 1894 and in 1895, both Logan and Butters, however, remaining members of the different firms existing during that period, and the firm being known as F. G. Logan & Co.

On March 1, 1896, written articles of copartnership were entered into between said Butters and appellees, which provided that the business of commission merchants should be carried on by the firm in Chicago and elsewhere under the firm name of F. G. Logan & Co. from March 1, 1896, to the last day of February, 1897, the capital of the firm to be $120,000, of which Frank G. Logan was to contribute $114,000, appellee Theron Logan $1,000, Butters $5,000, and appellee Bryan nothing; Frank G. Logan to have 19-32 of the profits, and also to draw monthly from the moneys of the firm $900; Butters to have 6-32 of the profits and draw monthly $500; Theron Logan to have 2-32 of the profits and draw monthly $250, and Bryan to have 5-32 of the profits and draw monthly $500; the several amounts to be drawn by the several partners to be charged to the expense account of the firm.   The losses of the business were to be borne by the respective partners in proportion to their respective interests in the profits thereof.  It was also provided that any partner might withdraw from the firm on thirty days' written notice, and should have the right to withdraw the just share of the capital and profits to which he should be entitled at the time of his withdrawal, but that his monthly allowance provided by the contract should cease on the date of such withdrawal.

Butters died August 12, 1896, leaving a will by which he appointed appellant his executor, who qualified as such. At that time the firm of F. G. Logan & Co. occupied a room in the Board of Trade building in Chicago under a sub-

lease from F. G. Logan to the firm, from April 1, 1896, to
March 31, 1897, at a yearly rental of $3,800, payable in
equal monthly installments. The lease provides that the
room should be used for the transaction of the firm business
and for no other purpose, and in case of default in any of its
covenants by the lessee, the lessor could declare the lease
ended and re-enter the premises, and also that the lease
should not be assigned, nor the premises let or underlet
without the written consent of the lessor, and in case of a
breach of this covenant the lease should be void, at the elec-
tion of the lessor. Frank G. Logan at this time had a lease
of the same room from the Board of Trade to himself from
May 1, 1896, to April 30, 1897, at the same rental he
charged the firm, and also a prior lease which expired
on April 30 1896. He also had had other leases of the
same room, the first of which commenced May 1, 1894,
and expired April 30, 1895, and a second lease, the same
that is above referred to, which expired April 30, 1896. He
sublet the room to the different firms in which he was a
partner, each sublease expiring at a date prior to the expira-
tion of his lease.

The firm also had leases of private telegraph wires from
different telegraph companies between different large cities
in the United States, principally between Chicago and other
cities, at large yearly rentals, all of which leases were sub-
ject to cancellation by either party at any time on thirty
days' notice, and any one could get a similar lease by pay-
ing similar rents. These wires were used to transmit
orders to the firm and for giving information by the firm as
to the condition of the markets. Each of the partners had
an individual membership in the Board of Trade of Chicago,
and Frank C. Logan owned a membership upon the New
York Stock Exchange.

The commission business, as conducted by the firm, was
largely a personal matter, and its extent depended upon the
personal acquaintance of the different members of the firm.
It was speculative, and its extent depended very largely
upon the personal confidence or trust of the different clients
in the judgment of the particular partner of the firm

who was called upon to transact the business. In many instances the names of the customers did not appear upon the firm's books except by numbers, the identity of the particular customer being known only to the member of the firm with whom he intrusted his business.

Settlements were made at the time of the several changes in the partners of the firm of F. G. Logan & Co., above referred to, in which the different partners receipted each to the other for all claims to accounts due to the old firm, and on one occasion, June 22, 1895, the partners indorsed in writing a trial balance of their books, which they stated contained all the assets and liabilities of the old firm, and thereby receipted " in full, each to the other, everything up to date." There was no mention at any time of good will on the books of the different firms of F. G. Logan & Co., of which Butters was a member. Butters did not contribute any capital to any of the different firms of F. G. Logan & Co. in which he was a partner prior to March 1, 1896.

At the time of the death of Mr. Butters the firm had on hand a large number of open trades, which extended for long periods, and in some instances for six months thereafter. These trades were of such a nature that the firm could not realize upon them until they expired, except by the order of the customer, and could earn no commissions thereon nor make any charges against the customers until the trades were closed. To close these open trades required that the business of the firm should be carried on for at least the period of six months, which would have entailed an expense of about $10,000 per month, which was about ten times the value of the open trades to the firm. Appellees took these open trades and the full commissions, when they were settled up, to which the firm would then have been entitled, and credited the firm of F. G. Logan & Co. with one-half of that amount.

After the death of Mr. Butters appellees continued to do business until October 10, 1896, under the firm name of F. G. Logan & Co., at the same place, with the same capital and in the same manner as they had transacted business

prior to his death. During this time they acted under the advice of appellant, who is an attorney at law. Appellant told appellees, about the 1st of October, 1896, that, inasmuch as he was trustee and executor under the will of Mr. Butters, they should get another attorney. Appellees thereupon procured other counsel and proceeded at once to settle the partnership estate in the Probate Court. On October 10, 1896, they sent the following telegram over their wires to all customers who had open trades with the firm, to wit:

"Owing to the death of our late partner, Daniel Butters, and the dissolution thereby of the partnership heretofore carried on under the firm name of F. G. Logan & Co., of Chicago, composed of Frank G. Logan, Daniel Butters, Ben B. Bryan and Theron Logan, said firm has ceased doing business, and a new partnership has this day been formed by the undersigned for the transaction of a general commission business, under the firm name of F. G. Logan. If you desire us to transfer your open trades or balances to the new firm, kindly wire us to that effect, otherwise wire us what other disposition to make of them.

Chicago, October 9, 1896.

FRANK G. LOGAN,
BEN B. BRYAN,
THERON LOGAN."

They also at the same time published a similar notice in leading newspapers in Kansas City, New York, Minneapolis, St. Louis and Chicago.

Appellees also formed a new partnership under the name of F. G. Logan, opened a new set of books, and, in all instances where ordered, transferred the trades of F. G. Logan & Co. to the books of the new firm.

On the same date appellees tendered to appellant the sum of $9,812.60, being $4,257.83 for Butters' proportion of the profits in the firm of F. G. Logan & Co. up to August 12, 1896, which was 6-32 of such profits; also $523.77 for Butters' interest in the profits of said firm from August 12th to October 10, 1896, being 1-24 of such profits, his monthly allowance as provided by the partnership articles being deducted; also $31 as the share of Butters in the furniture belonging to said firm, being 6-32 of its appraised value; and also $5,000, being for the capital

contributed by Butters to the capital stock of said firm. Appellant received from and receipted to appellee Frank G. Logan for said total amount, but qualified his receipt by stating that it should not be taken or considered as a final or full settlement of the interest of Butters in the assets of said firm, but for money paid on account of the same.

October 7, 1896, appellees, as surviving partners of the firm of F. G. Logan & Co., caused to be appointed appraisers of the partnership estate by the Probate Court of Cook County, and thereafter they filed an inventory and supplemental inventory in said Probate Court of the partnership estate, in which was included the lease of the room in the Board of Trade building, and also said wire leases, but they did not include any good will of the late firm, nor said open trades. The report of the appraisers set down the said leases as being of no value. Appellees filed in said Probate Court a report showing among other things that they had closed out said open trades of the late firm and charge one-half the commissions to be derived therefrom by the late firm to themselves, although said trades had not been consummated and could not be consummated until an order should be received from the customers directing the closing thereof, and no commissions had been earned or collected by appellees at the time of the death of said Butters. The one-half of the full commissions was thus included in the report of the profits of the late firm up to August 12, 1896, the date of Butters' death. The whole report thus made to the Probate Court included the total amount coming to the estate of said Butters from appellees, to wit, $9,812.60, as above stated, as having been paid over to appellant by appellees.

The said inventory, supplemental inventory and report of appraisers was approved by the Probate Court, and the same were found to be correct by the chancellor, except as to the item of net profits of the late firm from August 12 to October 10, 1896, which was modified by the chancellor, who found that appellant was entitled to 6-32 of such profits instead of 1-24, as stated in said report to the Probate Court, and which made a difference of $1,640.11 in

favor of appellant, which was directed to be paid to him by appellees.

It was further found by the decree, and the evidence in our opinion sustains the findings, that there was no good will of the firm of F. G. Logan & Co. at the date of Butters' death or since, and none was contemplated between the partners, and that said firm did not own a membership in the Chicago Board of Trade nor in the New York Stock Exchange; also that from and after October 10, 1896, appellees did not carry on any business under the name of, or belonging to F. G. Logan & Co., nor use any of the property of that firm in the business of F. G. Logan, but as surviving partners did promptly, and as was their duty, collect the accounts and choses in action belonging to said late firm and rendered on account thereof to appellant, and did pay over the same to him, except as specially found by said decree and herein above referred to.

It further appears from the evidence that at the death of Butters the capital of F. G. Logan & Co. was unimpaired; and that the estate of Butters was entitled to $5,000, or the 1-24 part thereof, which was paid to appellant by appellees; also that the lease to the firm of the room in the Board of Trade building, and also the said wire leases, were canceled on the 10th of October, 1896, by appellees, by indorsing the cancellation thereof on the face of such leases. Also that said leases were of no value.

It further appears, though not found by the chancellor, that prior to and up to the death of Butters the firm of F. G. Logan & Co. did a large and profitable business, the net profits amounting, the year prior to Butters' death, to $60,000, and had a large list of customers, with their addresses, who were scattered over a vast territory in the United States; also that after the 10th of October, 1896, appellees, under the name of F. G. Logan, did, at once, commence to do a large business, and earned a net profit of more than $5,000 per month.

The only oral evidence received on the hearing was that of Frank G. Logan. Appellant produced another witness, T. Carrabine, who testified that he was a dealer in lands in

old Mexico; had had some experience in buying and selling out businesses; had been engaged in the live stock commission business at Sioux City and in Chicago; had sold his good will in a certain firm at Sioux City; had had experience in Chicago with reference to good will, and that there was a custom among traders and business men with reference to getting at the value of a good will of a business, but that he had never been engaged in the commission business and had never been a member of the Board of Trade of Chicago.    The chancellor ruled out the evidence of this witness, and also held that appellant could not show by him the general custom adopted by commission merchants and others to arrive at the value of a good will, and also refused to allow the witness to state, in answer to a hypothetical question embodying an assumption of the facts shown in the other evidence as to the extent and nature of the business of F. G. Logan & Co., his opinion as to the value of the good will of such a business.    The chancellor held that the proof of a custom with reference to good will was not competent, and that it was immaterial whether the witness had an opinion as to the value of the good will or not.

Douthart & Brendecke, attorneys for appellant.

A dissolution by death puts an end to the partnership at that time, and the surviving partners become trustees by operation of law.    They hold all the partnership property as trustees, and it is their duty to close out the business and sell all the property, including the good will, if any there be, and distribute the proceeds.  · If they continue the business it is at their own risk, and they will be liable to the legal representatives of the deceased partners to account for the profits made after the decease, or may at the election of such representatives be charged with interest on the deceased partner's share of the capital and surplus, besides bearing all losses themselves.    Helson v. Hayner et al., 66 Ill. 487;  Forrester, Executrix, v. Oliver, Admr., 1 Ill. App. 259;  Remick, Admr., v. Emig et al., 42 Ill. 348;  Raymond v. Vaughn, 128 Ill. 256;  Beale v. Beale, 2 N. E. Rep. 65;  Clay

v. Field, 138 U. S. 464; Galbraith v. Tracy, 153 Ill. 54; Rammelsberg v. Mitchell et al., 29 Ohio St. 22.

The modern definition of the term " good will," as adopted by our Supreme Court, is : " The good will of a partnership may be defined as every possible advantage acquired by the firm in carrying on its business, whether connected with premises, or name, or other matter." Farwell et al. v. Huling, 132 Ill. 119; Bates on Partnership, Sec. 957; Story on Partnership, Sec. 99; A. & E. Ency. of Law, Vol. 8, 1366.

" If the language of Lord Eldon is to be taken as a definition of good will of general application, I think it is far too narrow, and I am not satisfied that it was intended by Lord Eldon as an exhaustive definition. Good will must mean every advantage—every positive advantage, if I may so express it—as contrasted with the negative advantage of the late partner not to carry on the business himself, that has been acquired by the old firm in carrying on its business, whether connected with the premises in which the business was previously carried on, or with the name of the late firm, or with any other matter carrying with it the benefit of the business; and it is absurd to say that when a large wholesale business is conducted the public are mindful whether it is carried on in Fleet street or in the Strand." Trego v. Hunt, Law Reports, Appeal Cases 1896, 17.

Good will is generally used to denote the benefit arising from connection and reputation, and its value is what can be got for the chance of being able to keep that connection and improve it. Upon the sale of an established business its good will has a market value, whether the business is that of a professional man or any other person. Lindley on Partnership, 439.

Where there is no evidence to show the value of the good will, then the court will value it at so many years purchase on the average profits made by the firm previous to the time of dissolution of the firm. 17 Am. and Eng. Ency. Law, 1197; Lindley on Partnership, 448; Austin v. Boys, 2 De G. & J. 629; Mellesh v. Keen, 28 Beav. 453; Sheppard v. Boggs, 9 Neb. 257.

The good will does not belong to the surviving partners. but is an asset that must be sold with the other property

and an account of the sale thereof made to the estate of the deceased partner. Remick, Adm'r, v. Emig et al., 42 Ill. 348; Am. and Eng. Ency. 1371; Rammelsberg v. Mitchell et al., 29 Ohio St. 22; Willingford v. Burr, 17 Neb. 137; Sheppard v. Boggs, 9 Neb. 258; Hathaway v. Bennett, 10 N. Y. 108; Hays, Adm'r, v. Hay, 6 Atl. Rep. 12; 2 Lindley on Partnership, 443; Crowshay v. Collins, 15 Vesey, 226; Smith v. Everett, 27 Beav. 451; Wedderburn v. Wedderburn, 22 Beav. 103; Dougherty v. Van Nos, 1 Hoffman (N. Y.), 68; Dayton v. Wilkes, 17 Howard Pr. (N. Y.) 510.

The assets, including the good will, should be sold altogether as a going business, and not in piecemeal or as a dead concern. Mellesh v. Keen, 27 Beav. 236.

The canceling of the leases to the several offices and the private wire system, and the taking in place thereof new ones in the name of F. G. Logan, did not change the ownership, but the new leases became the property of the old firm. Gow on Partnership, 255; Featherstonhaugh v. Fenwick, 17 Ves. 298; Spears v. Willis (N. Y.), 45 N. E. Rept. 849.

Hamline, Scott & Lord, attorneys for appellees.

The surviving partners take title to all the assets. People, etc., v. White et al., 11 Ill. 342.

The executor has nothing to do with them. Miller v. Jones, 39 Ill. 61.

They have a right to continue in possession, settle business and then account to executor. Hayward v. Burke et al., 151 Ill. 130.

As surviving partners they may use firm name. Com. Nat. Bk. v. Proctor, 98 Ill. 558.

This possession will not be wrested from them save upon a clear showing of mismanagement. Bates, Partnership, 993; 17 Am. & Eng. Ency. Law, 115; Painter v. Painter, (Cal.) 36 Pac. Rep. 975; High on Receivers, 497.

Surviving partners may sell any of the property. Emerson v. Senter, 118 U. S. 8.

May make an assignment for the benefit of creditors or

mortgage it. Havens & Geddes Co. v. Harris (Ind.), 39 N. E. Rep. 49.

They have a right to retain the property until debts are all paid. Clay v. Freeman, 118 U. S. 106.

The Illinois administration act gives cumulative remedies to the executor. Nelson v. Hayner et al., 66 Ill. 487.

Under Secs. 87 and following sections (1 Starr & Curt. Stats. (2d Ed.), 317), if surviving partner does not make an inventory list of liabilities and appraisement of partnership affairs in sixty days a receiver may follow. But the surviving partners can not carry on the business for a single day after the death of deceased partner. Oliver v. Forrester, 96 Ill. 316.

Or spend the money of the firm in new contracts or purchases. Remick v. Emig, 42 Ill. 343.

In carrying on the business of the old firm after Butters' death the surviving partners, at the most, technically misappropriated Butters' capital. They are chargeable for all losses sustained, and are liable to pay to the executor at his election that proportion of the profits earned by the wrongful use of Butters' capital which such capital bears to the entire capital of the firm, i. e., one twenty-fourth part thereof, or be charged with interest upon the deceased partner's capital. 2 Lindley, Partnership (Ewell's Ed.), 976, 979, 981, 984–991; Gates v. Finn, L. R. 13, Ch. Div. 839; Mellersh v. Keen, 27 Beav. 242; Robinson v. Simmons, 146 Mass. 167; Bernie v. Vandever, 16 Ark. 616; Skidmore v. Collier, 8 Hun (N. Y.), 54; Story on Partnership, 343, 346; 17 Am. & Eng. Ency. Law, 1166; Millard v. Ramsdale, Harr. Ch. 393; Freeman v. Freeman, 142 Mass. 106; Durbin v. Barker et al., 14 Ohio, 311; Holmes v. Gilman, 138 N. Y. 369.

The case of Clay v. Field, 138 U. S. 474, is not to the contrary. Oliver, Adm., v. Forrester, 96 Ill. 324, held interest should be paid.

There were no open trades for surviving partners to inventory. Nelson v. Hayner, 66 Ill. 487, does not apply.

The lease of the office was subject to Logan's control. Medinah Temple Co. v. Currey, 162 Ill. 441; Taylor, Land-

lord and Tenant (5th Ed.), Par. 409; Doe v. Clark, 8 East, 185; Doe v. Hawke, 2 East, 481; 1 Wood, Landlord & Tenant (2d Ed.), 719.

There was no good will belonging to the firm of F. G. Logan & Co. at the date of Butters' death.

Good will—is it anything more than the probability that the old customers will resort to the old place? Remick v. Emig et al., 42 Ill. 348; Crutwell v. Lye, 17 Vesey, 346; Parson's Partnership (3d Ed.), 286; Chittenden v. Whitbeck, 50 Mich. 421; Cassidy v. Metcalf, 1 Mo. App. 601; Morgan v. Schuyler, 79 New York, 493; Moody v. Thomas, 1 Disney, 298; 1 Collier, Partnership (6th Ed.), 240; Bell v. Ellis, 35 Cal. 625; Potter et al. v. Gorman, 65 Ga. 14.

The latest English cases define it to be " every possible advantage acquired by a firm carrying on its business, whether connected with premises or name or other matter." Farwell v. Huling 132 Ill. 119, referring to Bates on Partnership, Sec. 657, based on Genesi v. Cooper, L. R. 14, Ch. Div. 596.

Lindley bases its value on absence of competition. 2 Lindley on Partnership (Ewell's Ed.), 859.

The surviving partner can not be prevented from engaging in same kind of business or from soliciting the old customers, unless he voluntarily makes a sale of the good will. Labouchere v. Dawson, L. R. 13, Eq. Cases, 324; Leggott v. Barrett, L. R. 15, Ch. Div. 309; Walker v. Mottram, L. R. 19, Ch. Div. 355; Pearson v. Pearson, L. R. 27, Ch. Div. 145; Vernon v. Hallam, L. R. 27, Ch. Div. 34 (1888); Trego v. Hunt, A. C. H. of Lds. (1896) 7, affirming Labouchere v. Dawson, *supra*, recognizing Walker v. Mottram, *supra;* 17 Am. & Eng. Ency. Law, 1189.

This has ever been the English rule in cases of involuntary sales. Crutwell v. Lye, 17 Vesey, 334; Johnson v. Hellely, 2 DeG., J. & S. 444; Jennings v. Jennings, L. R. 1, Ch. 378 (1898).

In the United States, selling partner may solicit old customers. No restraint on trade may rest on inference. Smith v. Gibbs, 44 N. H. 335; Findlay v. Carson (Iowa), 66

N. W. Rep. 761; White v. Jones, 1 Abb. Pr. (N. S.) 337; Hoxie v. Chaney, 143 Mass. 592; Bergamini v. Bastian, 35 La. Ann. 60: McCord v. Williams, 96 Pa. St. 80; Cottrell v. Babcock Printing Press Co., 54 Conn. 138; Bassett v. Percival, 5 Allen (Mass.), 345; Hanna v. Andrews, 50 Ia. 462.

In no case will the vendor, even in England, be prevented from setting up same kind of business. Trego v. Hunt, *supra;* Smith v. Everett, 27 Beav. 446; Hall v. Barrows, 4 DeG., J. & S. 150; Cook v. Collingridge, 27 Beav. 458, 2 Lindley, Part. (Ewell's Ed.) 860.

The American cases and earlier English cases hold that good will, at least where it consists of location, survives to surviving partners. Hammond v. Douglass, 5 Vesey, 539; Lewis v. Langdon, 7 Sim. 425 (1818); Robertson v. Guiddington, 28 Beav. 529 (1860); Smith v. Everett, 27 Beav. 454; Mellesh v. Keen, Ib. 240; Story on Partnership (5th Ed.), 161; Parsons on Partnership (3d Ed.) 482–262; 31 Cent. Law Journal, 157; Staats v. Howlett, 4 Denio, 560; Lobeck v. Lee (Neb.), 55 N. W. Rep. 650; Musselman's Appeal, 62 Pa. St. 81.

The partnership name survives to surviving partner. Webster v. Webster, 3 Swanst. 490; Lewis v. Langdon, 7 Sim. 425; Robertson v. Guiddington, 28 Beav. 535; Blake v. Barnes, 12 N. Y. Supp. 69; Story, Part. (5th Ed.) Par. 100 and note; Collier, Part. (8th Am. Ed.) Par. 162–3 and note; Hammond v. Douglass, 5 Vesey, 539; Crashaw v. Collins, 15 Vesey, 227; Kirkman v. Kirkman, 45 N. Y. Supp. 373; Hazard et al. v. Caswell et al., 93 N. Y. 259; Caswell v. Hazard, 121 N. Y. 484.

There is no good will in a Board of Trade business any more than in professional partnerships. 2 Bates, Partnership, 668; Story, Partnership (5th Ed.), 161; Collier, Partnership (6th Ed.), 241; Farr v. Pearce, 3 Madd. 78; Spicer v. James, Rolls M. & T. (1830); Davies v. Hodgson, 25 Beav. 127; Stuart v. Gladstone, L. R. 10, Ch. Div. 656; Austen v. Boys, 2 DeG. & J. 626; Mandeville v. Harmon, 42 N. J. Eq. 192; Tierney v. Klein, 67 Miss. 173; Rice v. Angell, 73 Texas, 350.

Douthart v. Logan.

Mr. Justice Windes delivered the opinion of the court.

As to the first question made by appellant, that there was a good will which was an asset of the partnership, there is an apparent conflict of authority.   On the question of fact as to whether or not, under the evidence, there was a good will of the firm of F. G. Logan & Co., different conclusions might be reached by reasonable and fair-minded persons. After a careful consideration of the evidence, we can not say that the finding of the learned chancellor on this question of fact is manifestly contrary to his conclusion that there was in fact no good will.   This being so, it is the duty of a court of review not to disturb the decree upon this point. Delaney v. Delaney, 175 Ill. 188; Biggerstaff v. Biggerstaff, 180 Ill. 407.

The Supreme Court of this State, in the case of Farwell et al. v. Huling, 132 Ill. 119, gives the following definition of good will:   " The good will of a partnership may be defined as every possible advantage acquired by the firm in carrying on its business, whether connected with premises, or name, or other matter."

In 2 Lindley on Partnership, *439, the author says:

" The term good will can hardly be said to have any precise signification.   It is generally used to denote the benefit arising from connection and reputation; and its value is what can be got for the chance of being able to keep that connection and improve it.   Upon the sale of an established business, its good will has a marketable value, whether the business is that of a professional man or of any other person."

In Mechem's Elements of Part., Sec. 87, the author quotes part of the above language from Mr. Lindley, and also the definition of good will as given in Story on Part., and further gives the definition of good will by Lord Eldon, viz.; " The good will of a trade is nothing more than the probability that the old customers will resort to the old place," and says that this definition is approved by Mr. Parsons in his work on partnership.

In Story on Part., Sec. 99, (7th Ed.), the author says:

" Good will may be properly enough described to be the advantage or benefit which is acquired by an establishment

beyond the mere value of the capital, stock, funds or property employed therein in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position or common celebrity, or reputation for skill or affluence or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices."

The author then proceeds to discuss different instances of the good will of different kinds of partnerships, and says further:

" It seems that good will can constitute a part of the partnership effects or interests only in cases of mere commercial business or trades, and not in cases of professional business, which is almost necessarily connected with personal skill and confidence in the particular partner."

In Parsons on Part. (3d Ed.), 286, the author says, in speaking of good will and the difficulty of giving a definition thereof, that a distinction has been taken between the interest of a partnership resting on the contracts of the firm with a third party and that which has no such foundation; but the author expresses a doubt as to whether this distinction rests on good authority or good reason. The same author, in this connection, says that the definition of good will above quoted from Lord Eldon, "is an exact statement of the legal meaning of good will." The same author also says that a distinction has been taken between " the good will of a partnership in trade and that of a professional partnership. Lawyers or physicians may become partners; but the good will attached to such a firm must be considered more as a personal than as a local thing. It is not a probability that the old customers will go to the old place, but to the same persons, wherever they may be."

In 1 Collyer on Part., Sec. 117, the author recognizes the same distinction that Mr. Parsons does as to good will resting on contracts of the firm with a third party and that which has no such foundation, and says that founded on special contract " is a commodity on which a valuation may be fixed," but as to the other class, no definite allowance can be made for it in case of the death of one partner, except in connection with the premises where the business was

conducted, and the stock in trade. This, the author says, applies solely to a mercantile business. He further says:

" In a business of a professional nature, as that of an attorney or apothecary, the good will attaches to the person, rather than to any other subject. Such part of it as is not personal is so small that equity will not regard it as matter of sale, even where the partnership is without articles. It seems clear, therefore, that upon the death of one partner the good will in these cases will survive to the survivor."

In 2 Bates on Part., Sec. 668, the author says:

" Good will is not strictly applicable to a professional partnership, for its business has no local existence, but is entirely personal, consisting in a confidence in the integrity and ability of the individual."

The following cases support the statements of the text writers above quoted, to the effect that there is no good will, except in cases of commercial or trade partnerships, and does not exist in cases of professional business depending on the personal skill and confidence in the particular partner. Farr v. Pearce, 3 Maddock's Rep. 74, which was a case of partnership between surgeons; Arundell v. Bell, 61 Law J., Pt. 1, 537, a partnership between solicitors; Austen v. Boys, 2 De Gex & J. 626, also a partnership between solicitors; Stuart v. Gladstone, 10 Law Rep., Ch. Div. 626–57, a case of partnership between India commission merchants; Rice v. Angell, 73 Tex. 350, a partnership between insurance agents; Tierney v. Klein, 67 Miss. 173–8, also a partnership in insurance agencies; Mandeville v. Harman, 42 N. J. Eq. 185, relating to a contract between physicians.

In the Stuart case, *supra*, the decision rests mainly upon the construction of articles of copartnership, but the master of the rolls, in considering what was the so-called good will of commission merchants, said he was unable to understand what the good will of a business of that kind could mean.

In the Austen case, *supra*, the court say:

" The term good will seems wholly inapplicable to the business of a solicitor, which has no local existence, but is entirely personal, depending upon the trust and confidence which persons may repose in his integrity and ability to conduct their legal affairs."

In the Mandeville case, *supra*, the court, in speaking of good will in the case of a professional business, says: " Professional skill, experience and reputation are things which can not be bought or sold. They constitute part of the individuality of the particular person and die with him." \* \* \* " The practice of a physician is a thing so purely personal, depending so absolutely on the confidence reposed in his personal skill and ability, that when he ceases to exist it necessarily ceases also, and after his death can have neither an intrinsic nor market value." This was a case of alleged good will based upon contract, but the contract was held to be void, as being in restraint of trade.

In Scudder v. Ames, 142 Mo. 187, 230, which was a partnership in the business of pork packing and commission, the court held that there might in such a business be a good will, but that because the surviving partner was under no obligation to retire from business because of the dissolution of the partnership, it was of no appreciable value, and therefore that the administratrix should not be charged with anything on account thereof.

In Williams v. Wilson, 4 Sand. Ch. (N. Y.) 405, the court held that there was a good will in a business which was in part that of a private asylum for the insane and in part a boarding house for emigrants, and the receiver was directed to sell the lease of the premises where the business was conducted with the good will and the movables which belonged to the institution.

In the case of Webster v. Williams, 62 Ark. 101, the court recognizes the right of physicians who were partners to contract with reference to the good will of their professional business, and holds such a contract to be valid, but does not discuss the question as to whether good will could exist in such a business independent of a special contract.

In Dwight v. Hamilton, 113 Mass. 175, a contract, by which a physician sold his " practice and good will," was held to be valid and binding upon the parties thereto.

Numerous other cases may be found in the books in which contracts with reference to the good will of different lines of business have been upheld and enforced, and we have no

doubt that good will, as it relates to a business which depends upon the personal skill or confidence of customers in the partners, exists and is a proper subject of contract; but as said by Mr. Collyer: "Such part of it as is not personal is so small that equity will not regard it as matter of sale," except its value is recognized and determined by special contract of the parties.

In Sheppard v. Boggs, 9 Neb. 257, the court decreed an accounting including the good will in a partnership between insurance agents. This is the only case to which our attention has been called, or which we have been able to find, in which it has been held that a good will existed as to other than purely commercial or trade partnerships, or which were in part businesses of that nature, except by virtue of a special contract which recognized the existence of such an asset of the partnership.

In the case of Raymond v. Vaughan, 17 Ill. App. 144-9, the court, in speaking of a partnership between sugar brokers, says: "The good will was an element of value, and even though there had been a dissolution the appellant might be required to account" (citing cases); but an examination of this case shows that there was no question of good will to be decided, but only an accounting as between the partners as to business done. An examination of the cases cited shows that they do not refer to good will except as connected with a commercial or trade business. As appears from the statement preceding this opinion, the evidence was that the business was largely personal in its nature. Each partner had his particular friends and clients, who confided in him and trusted to his judgment, and therefore gave their business to him, and in many instances the customers were known only to the particular partner with whom they did their business; their names did not appear on the firm books, and they were known to the other partners only by numbers which appeared on their books. We see no reason why there should be a good will to such a business which could exist independent of a special contract, more than in a business purely professional, as in case of a physician or attorney at law. We conclude, therefore, that

as matter of law, under the evidence in this case, there was no good will of which a court of equity would take cognizance in the absence of a special contract.

It follows that there was no error in the exclusion by the chancellor of the evidence offered as to the value of the good will.

As to the lease of the firm office and the wire leases, we are of opinion that the evidence is clearly to the effect that they were of no value, and it would have been a useless thing to have required their sale. The same is true as to the open trades which were not inventoried; and besides we are further of opinion that the estate of Mr. Butters realized far more by the method adopted with regard to these trades than it could possibly have done by their sale.

As has been stated, appellees, after October 10, 1896, did an entirely new business, after having fully accounted with and paid to appellant all the interest of the estate of Butters in the late firm of F. G. Logan & Co., and were under no obligation to account to appellant for the profits of any such new business conducted by them. We think that in this regard the decree of the chancellor was correct.

The decree, however, in requiring appellees to account to appellant for six thirty-seconds instead of one twenty-fourth of the net profits of the business of F. G. Logan & Co. from August 12th to October 10, 1896, was, in our opinion, erroneous. Appellant was only entitled to that proportion of the net profits during this period which the capital contributed by Mr. Butters bore to the whole capital of the firm. His capital was one twenty-fourth of that of the firm. Holmes v. Gilman, 138 N. Y. 369–79; Freeman v. Freeman, 142 Mass. 98–104, Robinson v. Simmons, 146 Mass. 167–76.

The decree of the Circuit Court is in all things affirmed, except as to the allowance to appellant of six thirty-seconds of the said profits from August 12th to October 10, 1896, in which respect it is reversed, with directions to modify it so as to allow appellant one twenty-fourth of such profits. Appellant will pay all costs of the Circuit Court and of this appeal. Affirmed in part and reversed in part.