## George W. Saul v. William R. Busenbark.

1. EMPLOYER AND EMPLOYE—*What Creates No Legal Liability.*— The fact that services rendered by an employe to his employers result in a benefit to a third person creates no legal liability on the part of such third person to the employe when such third person is one of the common employers.

2. IMPLIED CONTRACTS—*Without Agreement of the Parties.*—There can be no implied contract where there is no agreement of the parties, but such an agreement may be inferred or may be presumed from facts and circumstances showing an intention.

Assumpsit, for commissions. Trial in the Circuit Court of Cook County; the Hon. ELBRIDGE HANECY, Judge, presiding. Finding and judgment for plaintiff; error by defendant. Heard in the Branch Appellate Court at the October term, 1898. Reversed. Opinion filed June 9, 1899.

DARROW, THOMAS & THOMPSON, attorneys for plaintiff in error.

WINSTON & MEAGHER, attorneys for defendant in error; JAMES F. MEAGHER and RALPH MARTIN SHAW, of counsel.

MR. PRESIDING JUSTICE FREEMAN delivered the opinion of the court.

This is an action in assumpsit in which it is sought to recover commissions from plaintiff in error and compen-

sation for services claimed to have been rendered at his request.

The case was by agreement submitted to the court without a jury.

The defendant in error, Busenbark, was seeking to do business as a broker in New York City. An arrangement was made between him and plaintiff in error by which the two came to Chicago, and here, Busenbark introduced Saul to Mr. John R. Walsh and Mr. Andrew McNally, whom it sought to interest in a matter Saul had in hand. As a result a contract was made between the three last mentioned. At that time Saul owned or controlled nine thousand shares of stock of the Cleveland, Akron & Columbus Ry. Co. This was not a majority of the shares, and other parties in New York were seeking to obtain the controlling interest. Saul believed that if they succeeded, the value of his stock would be impaired, and was apparently seeking for money or co-operation to enable him to obtain stock enough to secure control for himself, or for a combination with which he should be connected. A contract and pooling arrangement with Walsh and McNally was made for this purpose. Aside from the stock held by his New York antagonists, the balance of the power was with the stock then owned in Holland. By the terms of their contract with Saul, Walsh and McNally agreed to advance the money necessary to acquire a majority of the whole issue of stock, to be purchased, if possible, upon terms satisfactory to them. It was provided that any expense incurred in attempting to purchase stock should be paid—two-fifths by Saul and the remaining three-fifths by Walsh and McNally.

Busenbark was selected to go to Holland to buy stock, and Mr. Walsh furnished him a letter of credit in behalf of the three contracting parties who were to defray his expenses. The instructions with reference to the purchase of stock were to come from Mr. Walsh, who represented the other parties. No arrangement was made as to whether Busenbark was to receive anything for his services. He says he " was willing to leave that with those gentlemen."

His mission to Holland proved a failure. He could not buy the stock there, and was also unable to pool the stock held there with that held by his principals here.

By its terms the agreement between Walsh, McNally and Saul expired with the failure of the combination to purchase the additional stock within two months. A day or two before the expiration of that time, Saul received an advantageous offer for his stock from the opposing or Brice interest in New York, and with the consent and upon the advice of Mr. Walsh, sold out his nine thousand shares of stock at a figure considerably above what he could have obtained two months earlier.

It is now sought to recover from Saul for Busenbark's services, which it is claimed enhanced the value of Saul's stock and enabled him to obtain this additional price.

That the formation of the pool and the negotiations carried on in Holland did have some influence in that way, seems highly probable. Such is Mr. Walsh's opinion, who testifies that he told Saul that Busenbark's visit over there had helped him handsomely, and that Saul should pay Busenbark handsomely for what he had done. He also says that he told Busenbark, when the latter was going to Holland, that if he could not buy the Amsterdam stock he "expected he ought to help Saul out by keeping it from going to Brice," who it is said was also trying to buy this Holland stock. It is claimed that Busenbark's presence in Holland had a tendency to prevent Brice's success, and finally compelled him to protect himself by buying Saul's stock at an advance of ten dollars a share, amounting to $90,000.

Whether this sale was owing to Busenbark or not, the evidence does not clearly show. It seems to have been doubtful whether Brice could have obtained the Holland stock, even if Busenbark had never gone there. A letter written to Saul by Mr. Walsh the day after his return to London from a visit made by him to Amsterdam while negotiations were still in progress, says:

"The Amsterdam people talk very bitterly about Brice, and it is my opinion that it would be difficult for him to

buy the whole block, if it was for sale, at any price. If 12,000 shares or more are deposited in the new· trust, it is my judgment that Brice is done for, as the Amsterdam people will not combine with him, while they are willing to come in with us. I have no doubt that this number of shares will be deposited, but all the same if you can get Brice out by paying him twenty it will be a good thing to do. We have made some pleasant relations in Amsterdam and can, I think, work with them, but the profit, if any, is to come from buying up Brice, and to do this at a low price will be easier when he comes to understand that the Amsterdam people will have nothing to do with him."

This seems to indicate that the effort, if such effort there was, to keep the Amsterdam people from selling out to Brice was made in behalf of the combination by which Busenbark was sent to Holland, and not solely to promote the private interest of Saul.

Saul, however, did recognize that the combination with Walsh and McNally had been of service to him, because he acceded to Walsh's suggestion that he himself ought in fairness to bear all of Busenbark's expenses, although by the terms of the contract he was to bear only two-fifths. Saul repaid Walsh the whole amount, two thousand dollars, which the latter had advanced.

From the evidence, therefore, it appears that Busenbark was instrumental in introducing Saul to Walsh and McNally, but that thereafter during the trip to Holland he was in the employ of the combination and not of Saul individually. Whatever advantage accrued to Saul from the trip to Holland appears to have resulted from the efforts of the combination, and it is clear that Busenbark is not legally entitled to compensation from Saul because of his work while in the employ of the combination. The benefit received from the European negotiations may have been the indirect result of the formation and operations of the pool, but we know of no legal ground for holding that services rendered by an employe to his employers, because they result in benefit to a third party, can create a legal liability on the part of such third party to the employe even when, as in this case, the third party was one of the common employers.

The truth seems to be that Busenbark went to Holland and gave his time in the service of the combination without any arrangement whatever for compensation, in the same way and for the same purpose that Walsh and McNally made the arrangement with Saul, namely, in the expectation that if the scheme succeeded he would profit thereby. However that may be, his claim upon Saul was originally made, according to his own testimony, " for a settlement for my services in Europe under our contract or arrangement," and his services in Europe were, as we have seen, rendered to the combination, not to Saul individually.

His claim in this suit is for one-half of the alleged profit made by Saul upon the sale of his stock, which Busenbark estimates at $44,000, and is based upon an alleged " understanding " made at the Gilsey House, New York, in May and June, before the trip to Chicago and Holland. It is conceded, however, by Busenbark's counsel, that no express contract by Saul to pay for Busenbark's services is established, and it is clear that there was no individual liability for the European services, no matter what may have been the moral obligation.

The judgment in this case is sought to be justified under the *quantum meruit*. It is said the trial court found that there was " an implied contract of hiring." But there can be no implied contract where there is no agreement of the parties. Although this agreement be not formally expressed, such an agreement may be inferred, or may be presumed from facts and circumstances showing such intention; and the contract thus proven is called an implied contract. But in this case no intention to make a contract of hiring is shown, and no implied contract is proven. If it appeared from the evidence that Busenbark had been employed by Saul, and the terms of the contract of hiring only were in dispute, then the employe might perhaps recover the value of his services under a *quantum meruit*, no express contract as to the compensation for the services being proven. But in this case it appears that the services for which it is sought to recover were rendered, not to plaintiff in error, but to

the combination.   The evidence shows no contract of hiring, either express or implied, between Busenbark and Saul. In the absence of such contract, the fact that Saul received benefit from Busenbark's visit to Holland in the employ of other parties does not entitle the latter to recover in this action.

In view of what has been said it is unnecessary to consider in detail other specific points discussed at some length by counsel.   There being no legal liability under the facts as they appear from the evidence in behalf of plaintiff in error, the judgment of the Circuit Court must be reversed.