Acme Harvester Co. v. Craver.

## Acme Harvester Co. v. Charles F. Craver.

.110    413
a209s  483

1.  GOOD-WILL—*An Incident or Appurtenance to the Business Itself.*
—A contract of sale conveying an entire plant and everything thereunto
appertaining, includes the good-will of the business as appurtenant
thereto so far as it is capable of conveyance.

2.  SAME—*Confidence of Another Person in One's Personal Supervision Can Not be Bought or Sold.*—The confidence of another person in
work done under one's supervision, and personal good-will toward and
confidence in him personally, is something which can not be bought or
sold.

3.  SAME—*Exists Only in Purely Commercial or Trade Partnerships
Except by Special Contract.*—Good-will can not exist as to other than
purely commercial or trade partnerships or business of that nature,
except by special contract.

4.  SAME—*In Business of Professional Nature.*—In a business of a
professional nature, as that of an attorney or apothecary, the good-will
attaches to the person rather than to any other subject. Such part of
it as is not personal is so small that equity will not regard it as matter
of sale even where the partnership is without articles.

5.  CONTRACTS—*Ordinarily No Implied Contract Without Some
Agreement Between the Parties.*—Ordinarily there can be no implied
contract without some agreement between the parties as to the subject-
matter. If such agreement is not formally expressed it may be pre-
sumed from facts and circumstances showing an intention; as, where
one knowingly receives and enjoys services or property from another,
he may be held liable to pay therefor upon the theory of an implied con-
tract.

Assumpsit, for the price of a trade and good-will. Appeal from the
Superior Court of Cook County; the Hon. PHILIP STEIN, Judge presid-
ing. Heard in the Branch Appellate Court at the March term, 1902.
Reversed. Opinion filed November 17, 1903.

Appellee recovered judgment in the Superior Court for
the purchase price of certain trade and good-will alleged to
have been transferred by him to appellant, from which
judgment this appeal is prosecuted.

Facts out of which the controversy arises may be stated
briefly as follows : In January, 1900, a corporation known
as the " Harvester King Company " had been engaged in
the manufacture of harvesting machinery, having its plant
located at Harvey, Illinois. An important feature of its

business had been the manufacture of a machine spoken or as the "Randolph Header," which is said to have been peculiarly adapted to South American trade. The entire output of the factory for such trade had been sold to a New York firm known as John Dunn, Son & Co., who were the representatives of parties located and doing business in the Argentine Republic. This branch of the business originated in 1882. At that time the machine was manufactured by a firm known as Craver & Steele, located at Grinnell, Iowa, appellee Craver being one of its members. John Dunn, Son & Co., had written to Craver & Steele, whereupon Craver went to New York, and obtained an order for a couple of sample machines, and from this beginning the business of manufacturing these machines grew to such an extent that at one time as many as 2,100 were manufactured and sold to Dunn & Co. in a single year. In 1882 the firm of which appellee was then a member became Craver, Steele & Austin, and in 1890 the business was removed from Grinnell, Iowa, to Harvey, Illinois. In 1892 the Craver & Steele Manufacturing Co. was incorporated and continued the business until the fall of 1895, when, having become insolvent, its entire plant and material was sold to one David Kelley. The conveyance included all the real estate and personal property, all patent rights, and all property of every kind, nature and description, real, personal and mixed, with all claims, demands, rights, things in action and securities of every nature, in possession or expectancy, legal or equitable.

The purchaser, Mr. Kelley, continued the business, and organized the "Harvester King Co.," a corporation, to which he transferred the property acquired by him from the Craver & Steele Manufacturing Co. Appellee was subsequently employed by the new company at a salary of $300 a month, with, as he states, an agreement with Kelley that he should have half the profits of the business. He states that this was to be the consideration for his obtaining for the company the South American trade. Appellee states that he never received any profits.

Acme Harvester Co. v. Craver.

In January, 1900, the Harvester King Co. concluded to close up its business, and an option was given to appellee for the purchase of its entire capital stock. He endeavored to obtain a customer, and in this way, negotiations began which finally resulted in the purchase by appellant of the business of the Harvester King Co. Appellant at first refused to make the purchase, but finally concluded to do so. For his services in these negotiations appellee asked of Harvester King Co. a commission of $25,000 and was finally paid $5,000.

Previous to the consummation of this sale, one McCullough, a member of the firm of John Dunn, Son & Co., came to Chicago to see what arrangements could be made, if the Harvester King Co., which had been furnishing them the machines for their South American trade, went out of business, to obtain a future supply. He expressed a desire to have appellee continue to be connected with that part of the business as formerly, both as a matter of personal friendship, and because, having been connected for so long a time with the manufacture of these machines, his firm had confidence in appellee's supervision. To this, Mr. Binnian, president of appellant, replied that if he bought out the business of Harvester King Co., as it seemed probable he would, he was willing to employ appellee at a reasonable figure, but he did not want to be "held up." Before leaving Chicago, McCullough wrote to Binnian January 22, 1900, saying:

"I may have unwisely given Craver until February 1st to see what he can do, but my sympathy for him has prompted me to do so, as it seems my attitude in this matter means much to him. I have not the remotest idea that he can do anything within this time, but he has several schemes evolving in his mind, one of which in his optimism he thinks may possibly be successful. Can you not leave matters in shape, counting upon your departure before that time (February 1st) for San Francisco, so that we could work this business on the lines talked in the event of Craver's efforts being successful. I will regret exceedingly to think if, after all your trouble and deferred trip, that we are not to do something in this business."

Appellant concluded its purchase of the business of Harvester King Co. about January 29, 1900. Appellee was then asked to submit a written proposition stating the terms upon which he would engage in appellant's service, and did so by a communication of that date. Pending this proposition, appellee began, February 3, 1900, to work for appellant, and was appointed general manager of the shops at Harvey.

Matters remained in this condition until March 10th, when appellee wrote a long letter setting forth his claims, to which appellant replied with a counter proposition. Appellee refused it and threw up his position in appellant's service. He thereupon brought suit to recover the price and value of the trade and good-will of the South American business, alleging that he personally had acquired and controlled it, that appellant, being desirous of acquiring this business, negotiated with appellee to secure it, and thereupon appellee offered to turn it over to appellant, so far as he was able, in consideration of payment to him of $75,000, which appellant undertook and agreed to pay, and that appellee did turn over and convey to the defendant, so far as he was able, said trade and good-will, by reason of which appellant became liable. The issues were submitted to a jury, which returned a verdict for $20,750 in favor of appellee. Of this amount $750 was allowed by agreement between the parties as compensation to appellee for his services as an employe of appellant from February 3, 1900, to March 16th, when the employment terminated.

DEFREES, BRACE & RITTER, attorneys for appellant.

The good-will of a business is an intangible thing, which is an incident or appurtenant to the business itself, and follows the ownership thereof, and is not capable of separation or independent ownership, or of being made the subject of bargain and sale, except in connection with the sale of the business. 14 Am. & Eng. Enc. of Law (2d Ed.), 1085, 1089; Sheldon v. Houghton, 5 Blatch. 285; Churton v. Douglas, Johnson V. C. 174; Menendez v. Holt, 128 U. S. 514; Brown Chemical Co. v. Meyer, 139 U. S. 540; Metropoli-

tan Bank v. St. Louis Dispatch Co., 149 U. S. 436; Same Case, 36 Fed. Rep. 722; De La Vergne Co. v. German Savings Institution, 175 U. S. 40; Fish Bros. Co. v. Fish, 82 Wis. 546; Brass & Iron Co. v. Payne, 50 O. St. 115; Morgan v. Rogers, 19 Fed. Rep. 596; Bell v. Ellis, 33 Cal. 620; Smith v. Gibbs, 44 N. H. 335; Rawson v. Pratt, 91 Ind. 9.

GEORGE P. CARY and ARCHIBALD CATTELL, attorneys for appellee; W. FORSE SCOTT, of counsel.

Professional good-will now held vendible commodity.

As to sale of solicitor's good-will. Crespigny v. Wittenoom, 4 Term Reports, 790; Whittaker v. Howe, 3 Beav. 383; Bunn v. Guy, 4 East. 190; Hanna v. Andrews, 50 Ia. 462; Aubin v. Holt, 2 K. & J. 66.

As to sale of medical practices. Hopkins' Unfair Trade, 137; Webster v. Williams, 62 Ark. 101; Butler v. Burleson, 16 Vt. 176; Dwight v. Hamilton, 113 Mass. 175; Pickett v. Green, 120 Ind. 584; Hoyt v. Holly, 39 Conn. 326; Tichenor v. Newman, 186 Ill. 267.

Only recent cases to contrary. Mandeville v. Harman, 42 N. J. Eq. 185.

Good-will attaches to any business or profession, and is salable. 2 Lindley on Partnership, 439; Hopkins' Unfair Trade, 62; Williams v. Wilson, 4 Sanf. Ch. 379; Sheppard v. Boggs, 9 Neb. 257; Bingham School v. Gray, 41 L. R. A. 243; Buckingham v. Waters, 14 Cal. 146; Succession of Journe, 21 La. Ann. 391; Munsey v. Butterfield, 133 Mass. 492.

May be subject-matter of contract in whole or in part. Am. & Eng. Ency. Law, 2d Ed., 1088; Cruess v. Fessler, 39 Cal. 336; Herfort v. Cramer, 7 Col. 483; Costello v. Eddy, 58 Hun, 605; Willett v. Blanford, 1 Hare, 253.

MR. PRESIDING JUSTICE FREEMAN delivered the opinion of the court.

Appellee seeks to recover upon an implied contract on the part of appellant to pay him the price and value of the good-will of the New York firm, John Dunn, Son & Co., whose trade and patronage he claims to have controlled

and enjoyed for a number of years and to have transferred to appellant. It is not claimed that there was any express contract. There is but little controversy as to material facts. The contention is rather as to the construction to be placed upon admitted facts. It is claimed by appellee, first, that he owned the good-will in question; that is, that he owned the control of the trade and patronage of John Dunn, Son & Co., of New York, and the right to supply them with the special class of harvesting machines used in their South American trade; second, that he offered to sell it to appellant; third, that there was an implied agreement by appellant to purchase it; fourth, that appellee delivered it to appellant.

The claim of appellee's ownership is based on evidence tending to show that the patronage of John Dunn, Son & Co. had originally come to the firm of which appellee was then a member, about eighteen years before, and had continued during the succeeding years to be given to the firms and corporations with which in turn appellee had been connected either as a principal or an employe, and that it was given to them on his account as a personal favor to him, and followed him wherever he went. Facts like these, however, can not be deemed sufficient upon which to base a claim of title or ownership. Appellee is not suing for alleged services in carrying this trade with him to appellant, or inducing the New York house to give its patronage. He claims to have owned this good-will which gave him the trade and patronage in controversy, and that consequently when appellant acquired it there arose an implied obligation to pay him what it was worth. He does not claim to have had any contract with the New York house wherein they agreed or bound themselves to give him their trade. He does not claim to have been able to guarantee to appellant or any one else that John Dunn, Son & Co. would give their patronage to one who might buy it of him. All that he claims to have been able to do was to use his influence to transfer it "so far as he was able."

The good-will in question was something which John

Dunn, Son & Co. permitted him to enjoy, but to which they gave him no legal title, and might withdraw at their pleasure. They and their South American customers had acquired confidence from long experience that the machines made for them under appellee's supervision would continue to give satisfaction as they had done. They were desirous, therefore, that appellee should continue to have charge of their manufacture, and were doubtless willing to give their patronage to any competent house with which he should be able to identify himself; provided, however, they were assured that such house or appellee would be able to supply them without fail in the ordinary course of business. Within this limitation they were apparently willing that appellee should control the transfer of their patronage. But it is difficult to see upon what grounds the claim of an absolute ownership is based.

The contract of sale between the corporation, Craver & Steele Manufacturing Co., and Kelley, referred to in the foregoing statement, conveyed the entire plant and everything thereunto appertaining, and must be deemed, we think, to have included the good-will in controversy, so far as it was capable of conveyance, as appurtenant to the business. Wilmer v. Thomas, 74 Md. 485-490; De La Vergne Co. v. German Trust Savings Ins., 175 U. S. 40, 52. The contract of sale between Harvester King Co. and appellant contained a clause authorizing the purchaser to advertise as successor to Harvester King Co. "to the end that the good-will of the line of machines heretofore manufactured" by that company, "and the demand therefor, may be maintained with the agent and consumer." This indicates that the Harvester King Co. understood that it had a right to transfer, so far as it was able, and intended to transfer to appellant in connection with the property conveyed, the good-will of the business, including that in controversy here. It could not, of course, bind John Dunn, Son & Co., but it evidently did not consider itself under obligation to obtain appellee's consent.

The contract of sale to appellant contained a further

clause stating that it was mutually agreed to be desirable to retain appellee, who had been general manager for that company, in the employ of appellant, his duties to have special reference to the disposition of commission machines then on hand, which the purchaser undertook to sell; and appellant undertook to engage appellee " if a satisfactory contract" could be arranged. Negotiations to that end were at once undertaken, appellant asking appellee to submit a written proposition. Appellee did so, asking, in substance, as a consideration for engaging in appellant's service, either stock in the appellant corporation to the amount of $100,000 or $75,000 cash, at his option, " in full for the goodwill and the complete transfer to you and your company of the entire South American trade as far as my efforts can make such transfer complete, and also for such transfer of all harvester business that I can influence in the United States." He demanded in addition a salary of $6,000 a year.

It is said that by this proposition appellee offered to sell to appellant the good-will of the South American trade. Some stress is laid upon this alleged offer, as in some way binding upon appellant. The proposition was not accepted by appellant, and no intimation given to appellee nor any one else, so far as appears, that it would be. Appellee himself was not in doubt on that matter. In a letter dated February 5, 1900, he says : " I do not know definitely what he (appellant's president) has in his mind or what he proposes to do, but of one thing I feel confident from what he said that he was not willing to accept my proposition without modifications. Just what modifications he will ask I do not know, but in sending you this bill I am going on the presumption that Binnian and I will be able to make a reasonable if not entirely satisfactory arrangement by each making some concessions; but if we do not reach a satisfactory solution of the question within a few days I will notify you, for I am unwilling to engage in the service of the Acme Harvester Co. for a term of years, and do all that it is possible for me to do to transfer the good-will of

the business to them, unless I can feel that I am at least reasonably well treated."

The proposition made by appellee was not simply an offer to sell to appellant the good-will in controversy separate and apart from appellee's personal service, as it seems to be considered by appellee's attorneys. It stated that appellee was " willing to engage " in appellant's service " in connection with the harvester business now in contemplation." It is not an offer to sell the good-will independently. It was in substance an offer to sell his own services in obtaining the good-will and " transfer of the South American business as far as my efforts can make such transfer complete," his services to continue for " one or two years," as appellant might elect. This fact seems to have been lost sight of in the controversy. The suit is brought to recover for an alleged sale of the good-will merely, which, so far as appears, appellee had at the time no idea that he could sell, nor of offering to sell, apart from his services.

It is further contended in appellee's behalf, that there was an implied agreement on the part of appellant to purchase and pay for the South American business based upon the claim that it was transferred to appellant by appellee. That appellant eventually obtained the trade of John Dunn, Son & Co. is conceded; that it was transferred by appellee or through his efforts is denied. It is not contended that there was ever any actual agreement to purchase nor any actual transfer by appellee. An implied agreement can only arise in case the evidence shows that appellant knowingly received the trade in controversy and the benefit therefrom from appellee, and by reason of his services. This contention seems to require reference to certain uncontroverted evidence.

With the matter of salary and compensation still unsettled, appellee went to work for appellant February 3, 1900, both parties apparently proceeding upon the assumption that some agreement would be reached, but with full recognition on the part of appellee that a solution satisfactory to him might not be reached. Appellant appointed appel-

lee general manager of the shops at Harvey and a notice to
that effect, dated February 12th, was posted in the shops by
appellee. He assumed the duties of that position. March
10th appellee wrote to appellant a long letter, in which he
states that he wishes to have a definite understanding. In
reply appellant made a counter proposition of a salary of
$4,000 per annum and a share in certain profits, which it
states, according to appellee's figures, would net him about
$8,000 more. This offer appellee declined and left appel-
lant's employment. Thereafter he did what he could to
prevent appellant from obtaining the business of John
Dunn, Son & Co. but without success. This employment,
pending a definite agreement between the parties and last-
ing from February 3, 1900, to March 16th, created, doubt-
less, a liability against appellant to pay for the services
rendered, on the theory of an implied contract, and by
agreement between the parties on the trial the amount was
fixed at $750.

It is argued by appellee's counsel that appellant post-
poned notifying appellee that his proposition would not be
accepted, until it had made arrangements with the New
York firm for the latter's business, and it was too late to
make other arrangements. It is charged that " it was a
clear case of attempting to hoodwink both Craver and
McCullough." Appellee, however, knew all that time that
his proposition would not be accepted and there is evidence
not disputed which tends to show that John Dunn, Son &
Co. knew all the facts when the contract was made by them
with appellant for the manufacture of machines for the
South American trade for the ensuing season. McCullough,
of the New York firm, testifies that he was informed by
appellant's president early in February that appellee's
demand for stock or an interest in appellant's business
would not be complied with, and knew when the contract
with appellant was made, that the latter had not come to
any definite agreement with appellee. There were sound
business reasons, apparently, entirely independent of appel-
lee, why the New York firm should make the arrangement

with appellant.   The latter by its purchase of the personal property of Harvester King Co. had become the owner of the patterns, forms and extra parts of the machines furnished to the South American trade, as well as the machinery used in their manufacture.   These patterns, as McCullough states in a letter to appellee of January 11th, it would probably take a considerable time for any other firm to replace by new ones.   At the time that letter was written the New York firm were anxious that provision should be made for their supply of machines for the coming season, since the Harvester King Co. was going out of business, and the sale to appellant had not yet been made.   Appellee had been given by the New York house until February 1, 1900, to make arrangements to associate himself with parties who could supply the wants of the South American trade.   That house did make an effort to enable appellee to use its patronage for his own benefit, but at the same time gave him to understand that while doing this, they could not allow matters to be so delayed as to endanger their supply of machinery for the ensuing season.   Evidently John Dunn, Son & Co. did not regard appellee as having any ownership in their trade, nor did they place it in his hands to control as he might wish.   They notified him plainly that he could control it only on condition that he could arrange definitely and in apt time to furnish them their supply of machines, and that failing to do this, they would be obliged to protect themselves independently of him.   This they finally did, and made arrangements with appellant.   It does not appear that appellee could have prevented the consummation of this arrangement, nor, so far as we can see, that he had anything to do with bringing it about.   He tried to prevent it when he and appellant finally failed to make a satisfactory agreement, but did not succeed.

The jury answered certain interrogatories propounded by the trial court of its own motion, finding, first, that appellee sold and appellant bought from him the good-will in controversy; second, that appellee turned it over to appel-

lant; third, that appellant purchased and acquired it from appellee; and fourth, that it was mutually understood that appellee should be paid and compensated therefor by appellant.

There is no real dispute, as we have said, over the material facts upon which these findings were based. It is not claimed that there was any express contract of sale or purchase, that there was ever any actual transfer by appellee to appellant, that there was any actual understanding or agreement to pay appellee for the business of Dunn, Son & Co., and the question whether the facts, as shown by undisputed evidence, created a liability under the law, on the theory of an implied contract, is one of law for the court rather than of fact for the jury. If such liability existed as a matter of law, then it was the province of the jury to ascertain the amount due. Ordinarily there can be no implied contract without some agreement between the parties as to the subject-matter. If such agreement is not formally expressed it may be presumed from facts and circumstances showing an intention, as, where one knowingly receives and enjoys services or property from another, he may be held liable to pay therefor upon the theory of an implied contract. Saul v. Busenbark, 83 Ill. App. 256, 260; Idem, 184 Ill. 343, 347.

It is contended in behalf of appellant that the good-will of a business is an intangible thing, which is an incident or appurtenant to the business itself, and follows the ownership thereof; that it is not capable of separation or independent ownership, or of being made the subject of bargain and sale except in connection with the sale of the business, and that in this case the good-will passed to appellant by its purchase of the business of the Harvester King Co.

The trial court expressed grave doubts whether, as a matter of law, the subject-matter of this alleged contract constituted a property right capable of transference, but concluded that the interests of the parties would be best served by sending the case up at once, rather than to grant a new trial. The question here, it should be understood,

is not whether appellee could have recovered for services in procuring for appellant the patronage in controversy. The case was not tried nor was evidence introduced upon that theory. The question is whether appellee sold and delivered the patronage to appellant, making the latter liable on the theory of an implied contract to pay its value as purchase money. We have here the case of an employe whose employer had enjoyed the good-will and patronage in controversy, claiming the right of ownership and the right to sell it to a third party, who had already purchased of the employer the business, a part of which had been the supply of the trade upon which the very good-will and patronage claimed to have been thus sold, depended.

It is insisted by appellant's counsel, that the good-will of an established business can not be acquired or owned by a mere employe. It is true that in this case appellee enjoyed the favor of the New York house and doubtless might have himself enjoyed its continued trade and patronage had he possessed the means of carrying on the business and of supplying its wants for its South American customers. But he had no such means. What good-will had been formerly enjoyed by him and his partners, they had transferred to a corporation with which they were connected, and that corporation had transferred it to appellant's grantors. Yet he claims to have had not merely an ability to influence its transfer to concerns with which he should be connected, but its absolute ownership independent of the business which supplied the wants of the trade. And yet it is clear that there could be no such trade or patronage— it could not exist—independently of an ability to supply the machines which that trade demanded. This consideration alone would seem to dispose of the claim that the good-will, or patronage and trade in controversy, had become a property right of appellee. The interest of appellee in the good-will in this case was the confidence of John Dunn, Son & Co., in work done under his supervision, and personal good-will toward and confidence in him personally. This was something which could not be bought or sold. Mande-

ville v. Harman, 42 N. J. Equity, 185.    In the case of Dou-
thart v. Logan, 86 Ill. App. 294, after a consideration of the
general question the conclusion was reached that good-will
can not exist as to other than purely commercial or trade
partnerships or business of that nature, except by special
contract.    See cases there cited.    The court quotes from
Collyer on Partnerships, Vol. 1, Sec. 117, where it is said :
" In a business of a professional nature, as that of an attor-
ney or apothecary, the good-will attaches to the person
rather than to any other subject.    Such part of it as is not
personal is so small that equity will not regard it as matter
of sale even where the partnership is without articles."
The good-will which appellee claims to have sold and deliv-
ered in the case at bar, is of the same nature as that of a
lawyer or doctor, " entirely personal, consisting in the
integrity and ability of the individual" (2 Bates on Part.
Sec. 668), and incapable, we think, of transference except by
special contract, which in this case did not exist.    In Smith
v. Gibbs, 44 New Hamp. 335, 345, it is said that a contract
of sale of a business with its good-will " does not include
the popularity and personal qualities of the seller, which
are not transferable."    In the case at bar the good-will in
controversy, so far as appellee was concerned, was merely
his own popularity and personal qualities, which gave him
the confidence of the special customer.

    We are told by appellee's attorney that the definition of
good-will has been expanded of late in decided cases, and
that it is the whole advantage, whatever it may be, of the
reputation and connection of a firm or individual, built up
by years of honest work.    The question is not in this case
as to what appellee's so-called good-will consists of, but
whether it is a salable commodity apart from his personal
services in connection with it, which, of course, he might
contract to sell, but which it is not claimed he did sell.
We are cited among others to the case Tichenor v. New-
man, 186 Ill. 264, as sustaining appellee's contention.    But
that case was a suit for breach of contract by one physician
against another, who, for the more effectual transfer of the

good-will of his business which he had sold out, had entered into certain undertakings which he failed to carry out.   The case has no bearing, so far as we can see, upon the question under consideration here.   Counsel on both sides have displayed industry in examination and citation of authorities which we have considered, but no good purpose can be served by their further discussion.

For the reasons indicated the judgment of the Superior Court will be reversed with a finding of facts, and judgment entered here for the amount as to which there is no controversy, viz., $750.

Mr. Justice STEIN took no part in the decision of this case.